# 20-2778-CV

# United States Court of Appeals
*for the*
# Second Circuit

JOHN DOE,

*Plaintiff-Appellant,*

– v. –

HOTCHKISS SCHOOL,

*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (BRIDGEPORT)

## BRIEF FOR PLAINTIFF-APPELLANT

JED I. BERGMAN
KASOWITZ BENSON TORRES LLP
*Attorneys for Plaintiff-Appellant*
1633 Broadway
New York, New York 10019
(212) 506-1700

**TABLE OF CONTENTS**

**Page**

JURISDICTIONAL STATEMENT ...........................................................1

ISSUES PRESENTED...........................................................................2

STATEMENT OF THE CASE...............................................................4

    A.    Nature of the Action............................................................4

    B.    The Parties Enter Into The Binding August Settlement,
        And Hotchkiss Promptly Reports It To The District Court .................5

    C.    Hotchkiss Demands A Broader Release As The Parties Attempt
        To Negotiate Final Settlement Documentation....................................7

    D.    Doe Proposes The Compromise December Offer, Which Both
        Parties Repeatedly Counter And Reject.................................................9

    E.    The Parties Confirm That The December Offer Is Off The Table .....13

    F.    Hotchkiss Unilaterally Purports To Accept The December Offer
        As A Final Binding Settlement Agreement ........................................14

    G.    The Decision Below .........................................................................18

SUMMARY OF THE ARGUMENT .....................................................20

ARGUMENT .......................................................................................23

I.    STANDARD OF REVIEW.......................................................23

II.    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN
    FINDING THAT THE AUGUST SETTLEMENT WAS
    UNENFORCEABLE...............................................................23

    A.    The District Court Incorrectly Analyzed The MOU In Isolation,
        Rather Than As A Partial Memorialization Of A Broader Oral
        Agreement .......................................................................................24

B. The District Court Ignored the Fundamental Rule That Parties Can Enter Into a Binding Agreement Before Final Documentation, As They Did Here ........................................................24

C. Under The Correct Legal Test, The August Settlement Is An Enforceable Agreement .................................................................29

    i. The Language Used by the Parties Confirms Their Understanding that the August Settlement Is Enforceable .......30

    ii. The Circumstances Surrounding the August Settlement Prove the Parties Intended to be Bound by that Agreement ................................................................................32

    iii. Hotchkiss Had Motive and Purpose to Settle When It Did ......34

D. In Any Event, Hotchkiss Ratified The August Settlement And Is Estopped From Challenging It ........................................................35

III. THE DISTRICT COURT ALSO COMMITTED REVERSIBLE ERROR BY ENFORCING THE FEBRUARY DRAFT .............................40

A. The February Draft Was Not An Acceptance, Because Doe's December Offer Was Already Rejected, Countered, and Revoked ........................................................................................40

B. The February Draft Also Did Not Constitute A New Offer By Hotchkiss ....................................................................................44

C. Doe's Prior Counsel Never Had Apparent Authority To Accept The February Draft As A Binding Settlement ..................................45

D. Doe Never Ratified His Prior Counsel's Purported Acceptance Of The February Draft ....................................................................51

IV. IF NEITHER SETTLEMENT IS ENFORCEABLE, THIS COURT SHOULD REMAND THE ACTION FOR TRIAL .....................................58

V. ALTERNATIVELY, THIS COURT SHOULD REMAND FOR AN EVIDENTIARY HEARING .................................................................59

CONCLUSION ..............................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbadessa v. Moore Business Forms, Inc.*,
987 F.2d 18 (1st Cir. 1993)..............................................................................37

*Acheson v. White*,
487 A.2d 197 (Conn. 1985) .............................................................................46

*Ackerman v. Sobol Family P'ship, LLP*,
4 A.3d 288 (Conn. 2010) ......................................................................25, 46, 48

*Ahrens v. Dunkin' Brands, Inc.*,
2011 WL 60517 (D. Conn. Jan. 4, 2011)....................................................53, 54

*Alvarez v. City of New York*,
146 F. Supp. 2d 327 (S.D.N.Y. 2001) ..............................................................39

*Audubon Parking Assocs. Ltd. P'ship v. Barclay & Stubbs, Inc.*,
626 A.2d 729 (Conn. 1993) ........................................................................31, 59

*Autera v. Robinson*,
419 F.2d 1197 (D.C. Cir. 1969)..................................................................59, 60

*Backmon v. John D'Amelia & Assocs. LLC*,
2020 WL 311788 (D. Conn. Jan. 21, 2020),
*appeal dismissed*, 2020 WL 4333332 (2d Cir. May 14, 2020) ....................29, 31

*Beckenstein v. Potter & Carrier, Inc.*,
464 A.2d 6 (Conn. 1983) ..................................................................................47

*Bernstein v. Centaur Ins. Co.*,
644 F. Supp. 1361 (S.D.N.Y. 1986) .................................................................57

*Bobonik v. Medina Gen. Hosp.*,
126 F. App'x 270 (6th Cir. 2005)......................................................................60

*Botticello v. Stefanovicz*,
411 A.2d 16 (Conn. 1979) ...............................................................................53

iii

*Brandt v. MIT Dev. Corp.*,
552 F. Supp. 2d 304 (D. Conn. 2008), *order clarified on reconsideration*, 2008 WL 2230152 (D. Conn. May 29, 2008) .........................34

*Briga v. D'Amico*,
2006 WL 240557 (Conn. Super. Ct. Jan. 12, 2006) ....................................41, 42

*Broadmass Assocs., LLC v. McDonald's Corp.*,
286 A.D.2d 409 (N.Y. App. Div. 2001) .............................................................37

*Callie v. Near*,
829 F.2d 888 (9th Cir. 1987) .............................................................................60

*Capital Dist. Physician's Health Plan v. O'Higgins*,
951 F. Supp. 352 (N.D.N.Y. 1997), *vacated pursuant to settlement sub nom. Capital Dist. Physicians Health Plan, Inc. v. O'Higgins*,
1998 WL 34083619 (N.D.N.Y. Jan. 8, 1998) ...............................................56, 57

*Cavallo v. Lewis*,
473 A.2d 338 (Conn. App. 1984) ......................................................................42

*Cefaratti v. Aranow*,
141 A.3d 752 (Conn. 2016) .........................................................................46, 47

*Ciaramella v. Reader's Digest Ass'n, Inc.*,
131 F.3d 320 (2d Cir. 1997) ..........................................................23, 45, 49, 58

*Cmty. Collaborative of Bridgeport, Inc. v. Ganim*,
698 A.2d 245 (Conn. 1997) ..............................................................................53

*Colapietro v. Dep't of Motor Vehicles Connecticut*,
2011 WL 3349842 (D. Conn. Aug. 3, 2011) .....................................................34

*Cook v. Ball*,
144 F.2d 423 (7th Cir. 1944), *cert. denied*, 323 U.S. 761 (1944) ....................51

*Criscione v. Atl. Motors, LLC*,
2018 WL 6978702 (D. Conn. Dec. 7, 2018) .....................................................25

*Design Tech, LLC v. Moriniere*,
76 A.3d 712 (Conn. App. 2013) ........................................................................55

iv

*Directory Assistants, Inc. v. Albano*,
  2011 WL 577303 (D. Conn. Feb. 8, 2011) ........................................................34

*In re Dragone*,
  318 B.R. 33 (Bankr. D. Conn. 2004) ................................................................39

*Dunne v. Doyle*,
  2014 WL 3735619 (D. Conn. July 28, 2014) ...............................................41, 42

*E&W Const., Inc. v. Purcell*,
  2005 WL 407584 (Conn. Super. Ct. Jan. 12, 2005) .........................................58

*Edwards v. Born, Inc.*,
  792 F.2d 387 (3d Cir. 1986) .............................................................................50

*In re Eicholz*,
  310 B.R. 203 (W.D. Wash. 2004) .....................................................................57

*Fennell v. TLB Kent Co.*,
  865 F.2d 498 (2d Cir. 1989) .................................................................45, 48, 50

*Fischer v. Zollino*,
  35 A.3d 270 (Conn. 2012) ................................................................................38

*Front St. Commons, LLC v. Acadia Ins. Co.*,
  2018 WL 7572375 (D. Conn. Mar. 27, 2018) ...................................................35

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
  720 F.3d 84 (2d Cir. 2013) ...............................................................................51

*Gengaro v. City of New Haven*,
  984 A.2d 1133 (Conn. App. 2009) ...................................................................37

*Ghilduta v. Trump Corp.*,
  2007 WL 9813779 (S.D.N.Y. Nov. 5, 2007) .....................................................58

*Gomez v. City of New York*,
  805 F.3d 419 (2d Cir. 2015) .................................................................23, 46, 59

*Hawkins v. City of New York*,
  40 A.D.3d 327 (N.Y. App. Div. 2007) ..............................................................37

*Hensley v. Alcon Labs., Inc.*,
277 F.3d 535 (4th Cir. 2002) ...................................................................60

*Heublein v. Rudder*,
2007 WL 2472018 (D. Conn. Aug. 29, 2007).........................................25, 33, 42

*Hollywyle Ass'n, Inc. v. Hollister*,
324 A.2d 247 (Conn. 1973) ....................................................................48

*Indiaweekly.com, LLC v. Nehaflix.com, Inc.*,
2011 WL 13228319 (D. Conn. Feb. 4, 2011)...................................................58

*Johnson v. Schmitz*,
237 F. Supp. 2d 183 (D. Conn. 2002)..............................................46, 47, 50, 58

*Kaczmarcysk v. Dutton*,
414 Fed. App'x 354 (2d Cir. 2011) .............................................................49

*Kukla v. Nat'l Distillers Prod. Co.*,
483 F.2d 619 (6th Cir. 1973) ................................................................60, 61

*In re Lehman Bros. Holdings Inc.*,
2017 WL 3278933 (S.D.N.Y. Aug. 2, 2017), *aff'd*,
739 F. App'x 55 (2d Cir. 2018) .................................................................29

*Leser v. U.S. Bank Nat. Ass'n*,
2012 WL 4472025 (E.D.N.Y. Sept. 25, 2012) ...................................................56

*Massey v. Town of Branford*,
985 A.2d 335 (Conn. App. 2009) ................................................................28

*McKay v. Longman*,
2017 WL 2124117 (Conn. Super. Ct. Apr. 17, 2017), *aff'd*,
211 A.3d 20 (Conn. 2019) .......................................................................47

*Meridian Partners, LLC v. Dragone Classic Motorcars, Inc.*,
157 A.3d 87 (Conn. App. 2017) .................................................................28

*MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*,
1994 WL 560978 (S.D.N.Y. Oct. 12, 1994).......................................................51

*Monaghan v. SZS 33 Assocs., L.P.*,
73 F.3d 1276 (2d Cir. 1996) ....................................................................39

vi

*Mone v. Park E. Sports Med. & Rehab., P.C.*,
   2001 WL 1518263 (S.D.N.Y. Nov. 29, 2001)................................................39, 51

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) ..............................................................................8

*Murtha v. New York State Gaming Comm'n*,
   2020 WL 5504311 (S.D.N.Y. Sept. 9, 2020) .......................................................55

*Musso v. Seiders*,
   98 F. Supp. 2d 197 (D. Conn. 1999)....................................................................50

*Nieves v. Cmty. Choice Health Plan of Westchester, Inc.*,
   2011 WL 5533328 (S.D.N.Y. Aug. 31, 2011).....................................................49

*Omega Eng'g, Inc. v. Omega, S.A.*,
   432 F.3d 437 (2d Cir. 2005) ......................................................................*passim*

*Omega Eng'g, Inc. v. Omega, SA*,
   2004 WL 2191588 (D. Conn. Aug. 12, 2004), *aff'd sub nom.*
   *Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437 (2d Cir. 2005).......................32

*Ozyagcilar v. Davis*,
   701 F.2d 306 (4th Cir. 1983) ........................................................................59, 60

*Polk v. Sherwin Williams Co.*,
   2017 WL 1186323 (D. Conn. Mar. 29, 2017) .....................................................49

*Powell v. Omnicom*,
   497 F.3d 124 (2d Cir. 2007) ..............................................................29, 33, 41

*Price v. Kennison*,
   2010 WL 5610890 (Conn. Super. Ct. Dec. 23, 2010) .......................................44

*R.G. Grp., Inc. v. Horn & Hardart Co.*,
   751 F.2d 69 (2d Cir. 1984) ..........................................................................33, 49

*Rothenberg v. Kamen*,
   735 F.2d 753 (2d Cir. 1984) ........................................................................23, 59

*Saudi Basic Indus. Corp. v. Exxon Corp.*,
   364 F.3d 106 (3d Cir. 2004) ...............................................................................60

vii

*Schwarzschild v. Martin*,
464 A.2d 774 (Conn. 1983) ................................................................35

*Sims-Madison v. Inland Paperboard & Packaging, Inc.*,
379 F.3d 445 (7th Cir. 2004) ............................................................60

*Stewart v. Cendant Mobility Servs. Corp.*,
837 A.2d 736 (Conn. 2003) .........................................................38, 39

*Suncoast Capital Corp. v. Global Intellicom, Inc.*,
280 A.D.2d 281 (N.Y. App. Div. 2001) .............................................37

*Tanasi v. CitiMortgage, Inc.*,
257 F. Supp. 3d 232 (D. Conn. 2017)................................................46

*United States v. Hardage*,
982 F.2d 1491 (10th Cir. 1993) ........................................................60

*United States v. Tellier*,
255 F.2d 441 (2d Cir. 1958) ..............................................................54

*Updike, Kelly & Spellacy, P.C. v. Beckett*,
850 A.2d 145 (Conn. 2004) ...............................................................53

*Vincent v. Hull*,
2012 WL 12883961 (D. Conn. Dec. 11, 2012) .................................31

*In re von Bulow*,
828 F.2d 94 (2d Cir. 1987) ................................................................54

*Weeks v. United States*,
144 Fed. Cl. 34 (Fed. Cl. 2019) ........................................................51

*White v. Branchini*,
1996 WL 176380 (Conn. Super. Ct. Mar. 1, 1996)...........................28

*Winston v. Mediafare Entertainment Corp.*,
777 F.2d 78 (2d Cir. 1986) ...........................................................25, 30

*Young v. Data Switch Corp.*,
646 A.2d 852 (Conn. 1994) ...............................................................35

viii

**Statutes And Rule**

28 U.S.C. § 1291 ..............................................................................................1

28 U.S.C. § 1332(a) .........................................................................................1

D. Conn. L. Civ. R. 41(b) ................................................................................7

**Other Authorities**

RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981) ...............................................45

RESTATEMENT (SECOND) OF CONTRACTS § 27 (1981) ...............................................26

RESTATEMENT (SECOND) OF CONTRACTS § 35(2) (1981) ........................................44

RESTATEMENT (SECOND) OF CONTRACTS § 380 (1981) .............................................36

RESTATEMENT (SECOND) OF AGENCY § 119 cmt. a (1958) ......................................47

RESTATEMENT (THIRD) OF AGENCY § 4.01 cmt. g (2006).......................................51

12 Williston on Contracts § 35:30 (4th Ed. 2000).....................................................47

12 Williston on Contracts § 39:17 (4th Ed. 2000)..................................................56

Plaintiff-Appellant John Doe ("Doe") respectfully submits this brief in support of his appeal to the United States Court of Appeals for the Second Circuit from the Ruling and Order by the Honorable Victor A. Bolden of the United States District Court for the District of Connecticut (the "District Court"), dated and entered on July 24, 2020 (the "Order"), granting Defendant-Appellee The Hotchkiss School's ("Hotchkiss") motion to enforce a purported February 2020 settlement agreement; denying Doe's cross-motion to enforce a binding August 2019 settlement agreement; and dismissing the action (the "Action"). SPA-1-22.[1]

## JURISDICTIONAL STATEMENT

The District Court had subject matter jurisdiction based on diversity pursuant to 28 U.S.C. § 1332(a). This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291. The Order was entered by the District Court on July 24, 2020, finally disposing of the action against Hotchkiss, the sole defendant. A-35; SPA-1-22. Doe filed a timely notice of appeal on August 20, 2020. A-35; A-206-07.

---

[1] References to "A," "CA," and "SPA" are to the Joint Appendix, Joint Confidential Appendix, and Confidential Special Appendix, respectively, filed herewith. References to "DE" are to the docket in the action underlying this appeal, *John Doe v. The Hotchkiss School*, 3:15-cv-160 (VAB).

## ISSUES PRESENTED

This appeal arises from two disputed attempts to settle Doe's suit against Hotchkiss for the sexual abuse he suffered as a student. The first is a binding oral settlement agreement, which the parties entered into following a mediation in August 2019 and immediately memorialized in a signed Memorandum of Understanding ("MOU"), and which Hotchkiss partly performed that same day and then promptly reported to the District Court (the "August Settlement"). The second is a purported final settlement document from February 2020, with a much broader release provision, which Doe never signed, his counsel was never authorized to accept, and which he promptly repudiated (the "February Draft"). The District Court, on cross-motions to enforce, denied Doe's motion to enforce the August Settlement and granted Hotchkiss's motion to enforce the February Draft. The issues presented on appeal are:

1. Whether the District Court erred in concluding that the August Settlement was unenforceable, solely because the parties had yet to negotiate final documentation and left open certain details as to the language of the release, even though the signed MOU states that the parties "agreed to settle this lawsuit," and even though Hotchkiss partially performed that same day, promptly advised the District Court the parties had "reached a settlement," accepted the court's order

2

finding the case "settled in full" – thus canceling the impending jury trial – and did not challenge the August Settlement until nine months later?

2.      Whether the District Court erred in enforcing the February Draft, in which Hotchkiss purportedly "accepted" a draft that Doe had offered and signed two months earlier, in December 2019 ("December Offer"), even though during the intervening two months Hotchkiss rejected and countered the December Offer, the parties exchanged and rejected multiple counteroffers, and both parties subsequently acknowledged that the December Offer was off the table?

3.      Whether the District Court erred in finding, alternatively, that the February Draft was a new "offer," which Doe's contingency-fee counsel had apparent authority to accept, where:  the court improperly put the burden on Doe to negate apparent authority; there was no evidence that Doe, the principal, ever conferred such authority; and the court refused to consider proffered evidence demonstrating Doe's explicit instructions that prior counsel communicate to Hotchkiss and the District Court that he rejected the February Draft?

4.      Whether the District Court erred in concluding that Doe in any event ratified his prior counsel's actions by accepting a partial distribution of settlement proceeds from prior counsel, despite undisputed evidence showing that:  Doe repeatedly advised Hotchkiss that only he, and not his counsel, could accept a settlement; Doe instructed prior counsel to advise both Hotchkiss and the District

3

Court that he rejected the February Draft; and Doe intended to and did accept the payment under the binding August Settlement?

5. Alternatively, whether the District Court erred in disregarding Doe's sworn declarations and other supporting evidence and resolving disputed issues of material fact against Doe, the non-moving party, by enforcing the February Draft without conducting an evidentiary hearing?

## STATEMENT OF THE CASE

This is an appeal from the District Court's Order granting Hotchkiss's Motion to Enforce the February Draft, denying Doe's Cross-Motion to Enforce the August Settlement, and dismissing the Action.

### A. Nature of the Action.

This case arises from the serial sexual abuse and rapes Doe suffered as a minor while studying and boarding at Hotchkiss, part of Hotchkiss's admitted century-long history of tolerating and condoning many pedophile faculty members' serial sexual abuse of children. A-37-53. Most appallingly, a Hotchkiss faculty member and dormitory master, Roy Smith, sexually assaulted Doe on multiple occasions, culminating in a harrowing incident of involuntary drugging and rape. A-42-44 ¶¶26-38.

Doe sued in 2015, and on March 8, 2019, after four years of litigation, the District Court denied Hotchkiss's motion for summary judgment, paving the way

for the Action to proceed to trial on Doe's claims.  A-25; A-74-107.  On July 23, 2019, the District Court denied Hotchkiss's motion for reconsideration.  A-26; A-111-17.  A jury trial was set for November 4, 2019.  A-25.

### B. The Parties Enter Into The Binding August Settlement, And Hotchkiss Promptly Reports It To The District Court.

On August 27, 2019, the parties conducted a confidential JAMS mediation (the "August 27th Mediation").  CA-2 ¶3.  The August 27th Mediation was attended by Doe and his then-counsel ("Prior Counsel"), as well as Hotchkiss's Board of Trustees Co-President Robert Gould, who had authority to bind Hotchkiss, its Headmaster Craig Bradley, its counsel, and a representative of its insurer, Arrowood ("Arrowood").  CA-49-50 (Declaration of John Doe) ¶3; CA-2 ¶5.

After the mediation concluded, the parties remained at JAMS and negotiated further, reaching a simple oral settlement agreement resolving the case in full.  CA-49-50 ¶¶3-7; CA-2-5 ¶¶7-18.  The terms of the August Settlement are undisputed, including:  Hotchkiss apologizing to Doe for its wrongdoing described in the complaint, forming a Sexual Misconduct Advisory Committee, and making a settlement payment of a confidential amount, in exchange for which Doe would dismiss the action and release Hotchkiss for the claims asserted in the complaint.  In addition, the parties agreed to keep Doe's identity confidential.  CA-50 ¶7; CA-4 ¶12.  Before the parties shook hands, Doe asked Hotchkiss's lead negotiator,

5

Gould, if all terms had been agreed and no other terms were required. Gould answered that all terms had been agreed. CA-51 ¶9.

That same day, after the oral agreement, Gould and Bradley partially performed Hotchkiss's obligations under the newly formed August Settlement by orally apologizing in person to Doe, on Hotchkiss's behalf, for its admitted wrongdoing. CA-50 ¶8; CA-3-4 ¶¶9-10, 17. The apology was witnessed by both sides' counsel. *Id.*

The parties then drafted and executed the MOU on the spot, as a partial memorialization of their oral settlement agreement. CA-71-72 (MOU); CA-50 ¶10; CA-3-4 ¶¶10-11. The MOU recites that "Plaintiff John Doe and Defendant Hotchkiss School agreed to settle this lawsuit." CA-71. It sets forth key terms including the payment amount, the scope of the settlement ("for personal injuries as set forth in the Complaint"); the two confidential terms; and the timing of some formalization and execution steps: "[t]he release and documentation to follow within five (5) business days. Payment of settlement proceeds within thirty (30) days of settlement execution." *Id.* The MOU was signed by Doe and his Prior Counsel, and by Gould and Hotchkiss's counsel. CA-72.

The next day, Hotchkiss's counsel emailed Doe's Prior Counsel, suggesting that "I think we just let Judge Bolden's clerk know that *the case has been*

6

*settled. . . .* I can let him know that settlement paperwork is still be *[sic]*

processed." CA-74.[2]

On August 29, 2019, Hotchkiss's counsel reported the settlement to the

District Court: "The parties mediated the Doe case in New York City earlier this

week *and reached a settlement that was memorialized in a memorandum of*

*understanding.* The parties are currently working on the supporting

documentation." CA-58.

On September 11, 2019, the District Court entered an order noting that

"[t]he parties have reported that *this action has been settled in full*," and closing the

case immediately (the "September 11th Order"). A-27. The September 11th Order

started a 30-day countdown to automatic dismissal, unless the parties moved to

extend that deadline or to reopen the case. *See* D. Conn. L. Civ. R. 41(b).

Accordingly, the November jury trial did not occur.

> **C.** **Hotchkiss Demands A Broader Release As The Parties Attempt To Negotiate Final Settlement Documentation.**

In the ensuing weeks and months, Doe worked diligently to negotiate the

final settlement documentation, holding numerous telephonic and face-to-face

meetings, including with the JAMS mediator. CA-51 ¶12; CA-5 ¶22. Hotchkiss,

however, repeatedly insisted on broadening the scope of the release to include

---

[2]     All emphases are added unless otherwise noted.

additional persons and claims covered by Arrowood. *Id.* As Gould later explained

to Doe, "Hotchkiss did not want to abide by the terms of the August Settlement

because Hotchkiss's insurer would not reimburse it for the August Settlement

agreement payment without material changes to the terms the parties had agreed,

including specifically the scope of the release." CA-278 ¶12.[3]

On September 28, 2019, for example, Hotchkiss's counsel emailed Doe's

Prior Counsel a revised draft of the settlement documentation, noting that "this

includes the changes requested by counsel for Arrowood." CA-202. In early

November, as negotiations dragged on, Hotchkiss's counsel sent a further revised

draft, "reflecting the language that the School and Arrowood are prepared to sign."

CA-207. The cover email noted that the release (Paragraph 3.1) had been

broadened to include the phrase "or could have been asserted under any policies

issued by Arrowood to the School," specifically "at the request of Arrowood." *Id.*

Doe rejected all of these proposals, and counter-offered drafts reflecting the

specific release agreed in the August Settlement, which Hotchkiss rejected.

---

[3]     Notably, Hotchkiss had recently been sued by an insurer seeking to avoid coverage for a settlement Hotchkiss had reached with a different sexual-abuse victim. *See* Complaint, *Graphic Arts Mutual Insurance Company v. The Hotchkiss School*, Case No. 3:19-cv-00946, Dkt. No. 1 at ¶¶25-28, 34-59 (D. Conn.). The Court may take judicial notice of the publicly filed Complaint, which is not being cited for its truth. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 355 n.5 (2d Cir. 2010) (this Court has authority to take judicial notice of publicly filed complaint to establish the existence of a litigation).

8

On December 18, 2019, the parties and their counsel convened again (the "December 18th Meeting"). CA-51-52 ¶13; CA-6 ¶23. Hotchkiss again proposed a draft that would release claims against a far-reaching set of non-party individuals and entities, including Arrowood. *Id.*; CA-77-78 § 3.1. Hotchkiss's counsel, explaining that Arrowood had approved the draft, warned Doe that if he refused to sign it, Hotchkiss would move to enforce the August Settlement. CA-6 ¶23.

After four months of fruitless negotiations, Doe offered to compromise and accept part of that proposal – well beyond the August Settlement – in the specific interest of finalizing the settlement and receiving the settlement payment before year-end. As Doe was signing a draft agreement reflecting that compromise, however, Hotchkiss abruptly shifted course, declaring that it disagreed with Doe about the meaning of the new release language and orally rejecting the draft. CA-51-52 ¶13; CA-6-7 ¶25. Hotchkiss refused to deliberate further and left the meeting. *Id.*

### D. Doe Proposes The Compromise December Offer, Which Both Parties Repeatedly Counter And Reject.

On December 20, 2019, in a final attempt to compromise before year-end, Doe unilaterally signed a different compromise draft offer and emailed it to Hotchkiss ("December Offer"). CA-87-96; CA-52 ¶14.

Hotchkiss promptly rejected the December Offer. Hotchkiss wrote to Doe on January 3, 2020, that "[y]ou sent us a signed draft that we told you was not

9

acceptable." CA-100 ("January 3 Rejection"). Hotchkiss explained that it "was working on revisions to that draft" (*id.*), and later that day sent its counteroffer – a redlined copy of "DEFENDANT'S REVISION TO SECTION 3.1" – that materially broadened the scope of released claims. CA-105-06 ("January 3 Counteroffer").

Doe rejected that counteroffer, writing through Prior Counsel on January 6, 2020 that "[t]his proposed language torpedoes the deal." CA-108 ("January 6 Rejection"). Prior Counsel pointed out that "[t]he language as proposed now is too broad," and would cover claims "that ha[ve] nothing to do with the incidents as described in the complaint." *Id.*[4]

In the same email, Prior Counsel wrote that "[w]ithout more consideration, Doe won't accept it[, but that counsel was] not even sure [Doe] will accept it with more consideration" (*id.*), thus making clear that the compromise position Doe had offered in December 2019 was no longer available, and would not be re-offered without additional consideration from Hotchkiss.

In response, Doe sent his own counteroffer. CA-111 ("January 6 Counteroffer"). Hotchkiss rejected that counteroffer as well, sending Doe yet another "revised proposed release" on January 13, 2020. CA-110, 112 ("January

---

[4]    Hotchkiss was aware that Doe was contemplating bringing such claims, which the August Settlement did not release. CA-190 ¶¶14-15; CA-108.

13 Counteroffer")  Doe rejected that proposal too.  CA-114 ("Our client does not agree.") ("January 15 Rejection").

On January 17, 2020, with the December Offer for final documentation repeatedly rejected, countered, and withdrawn, Doe moved to reopen the case and enforce the August Settlement.  A-144-52.  Doe's motion stated that the parties "have not reached an agreement" as to the scope of the final release language and that, despite his past willingness to abide by the rejected December Offer, the parties had "reached an impasse" as to the final settlement documentation.  A-147.  Noting that "a binding agreement was formed on August 27, 2019, when the parties signed the MOU" (A-150), the motion asked the District Court to enforce the August Settlement.

That same day, Hotchkiss requested a status conference "to discuss the status of *the completion of* the settlement agreement between the parties."  A-141.  Complaining about the release impasse, Hotchkiss wrote that "[t]he Plaintiff refuses to agree to this additional sentence *despite the term of the MOU requiring a release*" (A-142) – thus treating the August Settlement as an enforceable agreement.

Hotchkiss also opposed the motion to reopen.  Its one-page response recognized that the District Court *could* "enforce the Memorandum of Understanding between the parties," but that doing so was not "necessary," and

11

requested a status conference to discuss "the efforts by the parties to reach a *final* settlement agreement." A-153.

At a telephonic status conference on January 27, 2020 – in which counsel was present, but Doe was not – both parties acknowledged that they had reached an impasse. Hotchkiss's counsel explained that "we asked for the plaintiff to basically send us back a version that would be acceptable . . . and they never came back to us" (A-199 at 5:02-06), and suggested a settlement conference with Magistrate Judge William I. Garfinkel, who might "help us come up with language that works for both sides" (A-200 at 6:04-05). Doe's Prior Counsel welcomed the suggestion, stating that "we've met and conferred to death over this case," and that a settlement conference before Judge Garfinkel "*will help us with our client* and the defendant to reach a finalized resolution on this one issue." A-201 at 7:11-19. Prior Counsel also requested a quick turn-around time to report back to the District Court, stating that "*[i]t gives my client less time to think about the case.*" A-204 at 10:05-11. The District Court referred the parties to a settlement conference before Judge Garfinkel, to be held on February 11, 2020 ("February 11th Settlement Conference"). A-28.

On January 28, 2020, Doe instructed Prior Counsel that "[i]f we communicate to Judge Garfinkel before the conference, he should know the plaintiff's starting point for any settlement discussion will be only the August 27th

12

oral agreement and the MOU." CA-284 (Doe email titled "The December 20th Rejected Amended Attempted Settlement Agreement Is Mutually Rejected Now").[5]

### E.    The Parties Confirm That The December Offer Is Off The Table.

With Doe's motion to enforce the August Settlement still pending, the parties and their counsel attended the February 11th Settlement Conference. CA-53 ¶16. Before the conference, the parties and their counsel met. Hotchkiss's Gould and its counsel made another alternative settlement proposal directly to Doe and his counsel ("February 11 Counteroffer"). Doe rejected the February 11 Counteroffer. CA-277 ¶8.

The settlement conference failed to resolve the impasse and concluded with no agreement on the terms of final documentation. A-29 at DE347 ("Case not settled."). After the conference, Gould asked to speak one-on-one with Doe, and Doe agreed. Both parties acknowledged that there was currently no open offer on the table. Gould reaffirmed that the December Offer was unacceptable to Hotchkiss, and stated several times that there was "no meeting of the minds" as to the terms of that proposal. CA-53 ¶¶17-19.

_____

[5]    As discussed below (Point III.D, *infra*), this communication by Doe to his Prior Counsel was not privileged, because it was intended to be communicated to Judge Garfinkel.

13

Doe concurred, explaining again that for tax and other reasons, the December Offer was not economically viable for him in 2020. CA-279 ¶13. Doe reiterated that there was no open offer for a final settlement on the table, that he would not accept a broader release provision without additional consideration, and that the only operative settlement between the parties was their original August Settlement. CA-53-54 ¶¶18-19. Gould confirmed that he understood, but that Hotchkiss, under pressure from its insurer, wanted a broader release than the August Settlement yet was unwilling to offer additional consideration. CA-53 ¶19; CA-278 ¶12. Doe also reminded Gould – as they had previously discussed – that only the parties, and not their counsel, could agree to a settlement. CA-277-78 ¶9.

**F.** **Hotchkiss Unilaterally Purports To Accept The December Offer As A Final Binding Settlement Agreement.**

With no live proposal for a final agreement, Doe's motion to enforce the August Settlement still pending, and its insurer still demanding a broader release, Hotchkiss took matters into its own hands. On February 19, 2020 – without reaching out to Doe or his Prior Counsel – Hotchkiss's counsel delivered to Doe's Prior Counsel the February Draft, which it labeled a "fully executed copy of the Settlement Agreement." CA-118-28. What Hotchkiss actually sent was the rejected-and-countered December Offer that Doe had signed back on December 20, 2019, together with two executed signature pages for Hotchkiss. CA-118-25, 126-27.

14

Upon receiving the February Draft, Doe's Prior Counsel replied to Hotchkiss's counsel "Thank you for the settlement agreement."  CA-251.  Prior Counsel went on to state that "I would like to close this one as soon as possible," asking "[p]lease can you urge your client to wire the funds into the [Prior Counsel] escrow account as soon as possible," and enclosing wire instructions.  *Id.*

Doe, however, swiftly and emphatically rejected the February Draft.  CA-55 ¶22.  On February 20, 2020 – the date Doe first saw the February Draft – he directed Prior Counsel to send a response to Hotchkiss's counsel "along the lines of:

> Dear [Hotchkiss's counsel]
>
> ***The purported replacement settlement agreement you emailed is rejected as invalid and not agreed***; it is a forgery of false completion.  It appears that in mid-February Defendants signed an agreement which in mid-December last year was rejected and not agreed, which in early January this year Defendant's counsel explicitly communicated was not agreed and not accepted, which has not been re-offered by Plaintiff, and which as recently as February 11 of this year Defendant co-signatory Bob Gould indicated was not agreed at Court during mediation.

CA-287.  Unbeknownst to Doe, Prior Counsel relayed none of this to Hotchkiss.

On February 25, 2020, Hotchkiss's counsel delivered to Doe's Prior Counsel a check for the Settlement Payment (which is the same under the August Settlement and February Draft).  CA-130-31.  When Doe learned of the payment,

15

he instructed Prior Counsel to write on the check "For August 27, 2019 Settlement Agreement, Under Protest," to "clarify what agreement it is accepted for." CA-292. Doe also directed Prior Counsel to advise the District Court, in a filing due that day, "that the payment is for the August 27, 2019 settlement agreement," and "not for the not-agreed false-completion-by-Defendant fraudulent [February Draft] purported agreement form." CA-298.

Prior Counsel did neither. In fact, Prior Counsel's February 25 filing initially stated – contrary to Doe's explicit instructions – that following the February 11 Settlement Conference, "the parties have executed a settlement agreement and release." A-156. Doe, upon learning of that filing, promptly directed prior counsel to "fil[e] a correction," explaining that "[t]he valid and only settlement agreement that the parties have agreed is the August 27, 2019 agreement," and that "[t]he settlement payment is owed for the August 27, 2019 settlement agreement, not for that false [February Draft] not agreed." CA-291. Later that evening, Prior Counsel filed a corrected motion that omitted the offending phrase. A-160.

On March 2, 2020, Prior Counsel sent Doe his share of the settlement payment, after deducting its outstanding costs and contingency fee. CA-55 ¶23; CA-184 ¶2.

16

On March 12, 2020, Doe's Prior Counsel moved to withdraw. A-167-70. Prior Counsel stated that it believed "that this matter is now fully settled," but that Doe "does not agree with [Prior] Counsel's position and will not agree to voluntary dismissal of the case at this time." *Id.*

The District Court held a telephonic status conference the next day. Doe joined the court call from his COVID-19 quarantine sickbed (CA-185-86 ¶7), his first opportunity since the February 11th Settlement Conference to address Hotchkiss or the District Court without channeling his position through Prior Counsel (CA-10; CA-281 ¶23). On the call, after Prior Counsel's withdrawal was granted, Doe – unrepresented and now allowed to speak for himself – reminded the court of his pending motion to enforce the August Settlement. The court stated that "I think there is a subsequent document," and addressing Hotchkiss's counsel, asked "am I correct that there is a subsequent settlement agreement after the one that was filed before?" CA-19 at 10:21-25. Hotchkiss's counsel confirmed: "Yes, your Honor." CA-20 at 11:01.

The District Court then remarked, "in my view that old [settlement] becomes moot based on the fact that there is a new agreement." *Id.* at 11:04-06. In response, Doe stated, "***Your Honor, I disagree. There was no new agreement***." *Id.* at 11:07-08.

17

Later that day, the District Court – citing what it characterized as "Mr. Doe's inability to maintain counsel" – formally granted the motion to withdraw, denied Doe's motion to enforce the August Settlement as moot, and authorized Hotchkiss to move to enforce the purported "current settlement agreement," *i.e.*, the February Draft. A-175-81.

Hotchkiss did so on March 19, 2020. A-30.[6] On April 30, 2020, Doe, now represented by undersigned counsel, opposed Hotchkiss's motion and cross-moved to enforce the August Settlement. The District Court heard oral argument on the parties' motions on July 15, 2020 by videoconference. A-34. It did not conduct an evidentiary hearing. *See generally* A-34-35.

## G. The Decision Below.

On July 24, 2020, the District Court issued the Order, which granted Hotchkiss's motion to enforce the February Draft; denied Doe's cross-motion to enforce the August Settlement; and ordered the case "dismissed and definitively closed." SPA-22.

With respect to the August Settlement, the District Court analyzed only the MOU (rather than the oral-and-written August Settlement as a whole) and

---

[6]    On March 24, 2020, the District Court ordered Doe to return all unused settlement funds to Prior Counsel's escrow account by March 27. *Id.* Doe complied in full. CA-55 ¶24; A-188.

18

concluded that the MOU was unenforceable because the parties "anticipated the execution of a final settlement agreement." SPA-12. The Order did not consider the well-settled rule that parties can enter into a binding *preliminary* agreement, nor Hotchkiss's August 29, 2019 representation to the court that the parties had mediated the case "*and reached a settlement that was memorialized in a memorandum of understanding*," with "supporting documentation" to follow. CA-58.

The District Court cited several grounds for enforcing the February Draft. The court found that Doe "unequivocally" agreed to be bound to the December Offer by signing and tendering it to Hotchkiss (SPA-14), and concluded that "there is nothing in the record suggesting that Mr. Doe [] expressed to Hotchkiss any intent to repudiate" the December Offer between December 20, 2019 and February 13, 2020, when Hotchkiss signed the February Draft (a week before delivering it to Doe's Prior Counsel) (SPA-15). In so holding, the court did not address the record evidence showing that Hotchkiss had rejected the December Offer, that the parties had made multiple counteroffers, that Doe had withdrawn the December Offer, or that Doe and Hotchkiss's principal had agreed that the December Offer was off the table when they spoke after the February 11 Settlement Conference. CA-100-14.

The District Court also concluded, alternatively, that Doe accepted the February Draft because neither he nor his counsel communicated Doe's rejection

19

of that "offer" to Hotchkiss. SPA-15. In reaching that conclusion, the court held that Doe's prior counsel had apparent authority to bind Doe to the February Draft, because Doe did not tell Hotchkiss, "in writing," that his prior counsel could not accept the settlement on his behalf. SPA-15-17.

The District Court further held that Doe ratified Prior Counsel's alleged acceptance by accepting the settlement payment. SPA-18-21. The court reasoned that Doe could not have accepted the payment under the August Settlement, as Doe maintained, because that agreement was unenforceable. SPA-20-21 & n.5. The court never addressed whether Doe *intended* to ratify the February Draft. The court also refused to consider Doe's emails to Prior Counsel instructing them to advise Hotchkiss and the court that he rejected the February Draft, concluding that the emails reflected selectively disclosed attorney-client-privileged communications. A-17 n.7.

Doe timely appealed the Order on August 20, 2020. A-206-07.

## SUMMARY OF THE ARGUMENT

The District Court's decision to enforce the February Draft while declining to enforce the August Settlement rested on a string of legally erroneous and factually unfounded conclusions.

Initially, the District Court improperly treated the parties' efforts to negotiate *final* settlement documentation as a dispositive bar to enforcing the August

20

Settlement.  But the August Settlement was a binding preliminary agreement, and black-letter contract law holds that parties can enter a binding agreement even though they contemplate negotiating and signing final documentation later in time. They did so here.

The District Court also never applied Connecticut law's three-factor test for analyzing preliminary settlement agreements; each factor here establishes that the parties intended to be bound by the August Settlement.  *First*, Hotchkiss demonstrated its intent to be bound through express language, including the signed MOU and its contemporaneous report to the District Court that the case was settled.  *Second*, Hotchkiss partially performed the August Settlement on the day it was formed.  And *third*, Hotchkiss had ample motive to settle when it did, approximately two months before a jury trial that would have placed the heinous conduct of its faculty and other agents under intense public scrutiny.  The August Settlement was thus fully binding and enforceable, and the District Court erred in holding that it was not.

The District Court's enforcement of the February Draft was likewise erroneous.  The court's holding that Hotchkiss accepted Doe's December Offer in February 2020 disregarded basic principles of contract formation.  Doe's December Offer was repeatedly rejected, countered, and revoked – all acts that extinguished Hotchkiss's power of acceptance as a matter of law.

21

The District Court also erred in deeming Hotchkiss's signed-and-purportedly-countersigned February Draft a new offer, and concluding that Doe's Prior Counsel had apparent authority to accept it on Doe's behalf. The court erroneously allocated the burden of proof on apparent authority to Doe, rather than Hotchkiss, and failed to apply the correct, two-prong test under Connecticut law. That test required Hotchkiss to show that Doe held out Prior Counsel as possessing authority; and that Hotchkiss relied, reasonably and in good faith, on any such representation. Not a shred of evidence in the record supports either prong. Indeed, the February Draft states that it only becomes effective when it is signed *by the parties themselves*. And Doe never signed it.

There was likewise no basis for the District Court's finding that Doe ratified Prior Counsel's unauthorized acceptance. The court rejected Doe's showing that he accepted the settlement payment pursuant to the August Settlement, citing its erroneous holding that the August Settlement was unenforceable. And the court failed to apply the correct legal standard, which required Hotchkiss to establish Doe's subjective intent to ratify. Again, nothing in the record supports that.

Because of these errors, this Court should reverse the decision below and remand for enforcement of the August Settlement. If the Court finds that *neither* of the putative settlements can be enforced, the case should be remanded for a trial

22

on the merits. Alternatively, if the Court finds disputed issues of fact as to the existence of a settlement, it should remand for an evidentiary hearing.

## ARGUMENT

## I. STANDARD OF REVIEW.

The District Court's legal conclusions are reviewed *de novo*. *See Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005). Properly made findings of fact are reviewed for clear error. *See id.* at 443; *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997).

Though the denial of an evidentiary hearing is typically reviewed for abuse of discretion, a hearing is required where there are factual disputes as to the existence of a settlement. *See, e.g.*, *Gomez v. City of New York*, 805 F.3d 419, 425 (2d Cir. 2015); *Rothenberg v. Kamen*, 735 F.2d 753, 754 (2d Cir. 1984); Point V, *infra*.

## II. THE DISTRICT COURT COMMITTED REVERSIBLE ERROR IN FINDING THAT THE AUGUST SETTLEMENT WAS UNENFORCEABLE.

The record below unambiguously establishes that the parties entered into a binding oral settlement agreement on August 27, 2019, with partial performance that same day and key terms reduced to writing in the signed MOU. The District Court's contrary holding (i) analyzed the wrong agreement, (ii) applied the wrong legal test, and (iii) ignored undisputed evidence.

23

**A.** **The District Court Incorrectly Analyzed The MOU In Isolation, Rather Than As A Partial Memorialization Of A Broader Oral Agreement.**

The District Court's initial error was in analyzing an incomplete memorialization of the August Settlement, the MOU, to conclude that the agreement was incomplete. It is undisputed that on August 27, 2019, the parties orally agreed on additional terms that were not reflected in the MOU, including Hotchkiss's written apology and its formation of a Sexual Misconduct Advisory Committee. CA-50 ¶4 (Doe affidavit describing material oral terms); CA-189 ¶5 (Hotchkiss affiant Gould, confirming oral agreement on apology and committee terms); *see also* A-144-45.

Accordingly, the District Court's holding that "*[t]he Memorandum of Understanding* [] cannot operate as a final binding settlement agreement, because the parties needed to resolve open questions," SPA-13 (internal quotations omitted), fails at the threshold. The court never even considered whether the parties' entire oral August Settlement, which was only partially memorialized in the MOU, was enforceable. As discussed below, it indisputably was.

**B.** **The District Court Ignored the Fundamental Rule That Parties Can Enter Into a Binding Agreement Before Final Documentation, As They Did Here.**

The District Court compounded this threshold error by analyzing whether the parties had entered into "a *final* binding settlement agreement" in August 2019.

24

SPA-12; *see also id.* ("*final* settlement agreement"); SPA-13 (holding that the

MOU "cannot operate as a *final* binding settlement agreement").

By focusing exclusively on whether the August Settlement was "final," the

District Court failed to apply the well-settled rule that parties can enter into a

binding and enforceable *preliminary* agreement, even though they intend to

negotiate and execute final settlement documentation.  Countless cases in

Connecticut and the Second Circuit so hold.  *See, e.g.*, *Omega*, 432 F.3d at 444

(settlement agreement binding even though it was preliminary and unsigned);

*Ackerman v. Sobol Family P'ship, LLP*, 4 A.3d 288, 310 (Conn. 2010) ("the fact

that an oral agreement was later to be memorialized in writing does not make it any

less enforceable" (internal quotations omitted)); *Heublein v. Rudder*, 2007 WL

2472018, at *6 (D. Conn. Aug. 29, 2007) ("[S]imply because the parties

contemplate memorializing their agreement in a formal document does not prevent

their agreement from coming into effect before written documents are drawn up.");

*Criscione v. Atl. Motors, LLC*, 2018 WL 6978702, at *4 (D. Conn. Dec. 7, 2018)

(quoting *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.

1986)) ("[T]he mere intention to commit the [settlement] agreement to writing will

not prevent contract formation."); *see also* RESTATEMENT (SECOND) OF CONTRACTS

§ 27 (1981) ("Manifestations of assent that are in themselves sufficient to conclude

25

a contract will not be prevented from so operating by the fact that the parties also manifest an intention to prepare and adopt a written memorial thereof . . . .").

The District Court ignored this settled jurisprudence, as well as the undisputed evidence that the parties entered into a binding preliminary agreement at the August 27 Mediation and expected to finalize settlement documentation in short order. *See* SOF § B; Point II.C, *infra*. Instead, the court refused to enforce the August Settlement because "a release and documentation were to follow," and because the parties' "negotiations in the months afterwards . . . anticipated the execution of a final settlement agreement." SPA-12. In other words, the District Court improperly relied on the parties' negotiations over *final* documentation to support its conclusion that they had not reached a binding *preliminary* agreement in August. That was error.

For the same reason, the District Court was wrong to rely on the fact that following the September 11th Order, Doe had filed four consent motions to extend the time before automatic dismissal because "additional terms concerning the release remain open." SPA-13. Those open terms related to the *final* settlement documentation; there was nothing "open" about the already-binding August Settlement that had induced the Court to enter the September 11th Order in the first place.

26

In fact, the August Settlement was clear as to its scope. The MOU identifies the parties (Hotchkiss and Doe) who are "settl[ing] *this lawsuit*," and recites that "[t]he settlement is for personal injuries as set forth *in the Complaint*" (CA-71) – affirming that the release would be coextensive with a dismissal with prejudice. Doe's sworn declaration further confirms that the parties orally agreed on August 27, 2019 that Doe would "release Hotchkiss from the claims asserted in the Complaint in the Action" (CA-50 ¶6), attesting that when Doe asked "if all terms had been agreed and no other terms were required," "Mr. Gould answered that all terms had been agreed" (CA-51 ¶9).

Hotchkiss's sole declarant, Gould, did not contest these facts. He averred that when Hotchkiss initially presented Doe with a draft of a *final* settlement agreement on August 27, Doe – in Gould's careful phrasing – "disagreed with *the language of the release*," and that because "the parties were unable to reach an agreement on the language for the release" for the *final* agreement, they drafted and signed the MOU. CA-189 ¶¶8-9. But the MOU provided that the parties had already "agreed to settle this lawsuit." CA-71. Nothing in the MOU conditioned *the existence of a binding agreement* on "the language of the release." *Id.* And Hotchkiss's explicit representation to the District Court confirmed that the parties had already "reached a settlement." CA-58.

27

The parties' decision to leave the language of the *final* release open for negotiation is no bar to enforcing the August Settlement. Connecticut courts regularly enforce preliminary settlement agreements without an express release term. Thus, in *White v. Branchini*, 1996 WL 176380, at \*1 (Conn. Super. Ct. Mar. 1, 1996), the court enforced an oral settlement over plaintiff's objection that "it did not include what the release language would be or who would be released." Holding that "[t]he release is incidental not essential," the court relied on its "inherent power to enforce the agreement without the use of a release by entry of a judgment." *Id.* Likewise, in *Meridian Partners, LLC v. Dragone Classic Motorcars, Inc.*, 157 A.3d 87, 94-96 (Conn. App. 2017), the court found that an orally stipulated settlement agreement was "unambiguous and complete," even though the contemplated documentation and mutual releases were not yet agreed. *See also Massey v. Town of Branford*, 985 A.2d 335, 339 (Conn. App. 2009) (settlement agreement not rendered ambiguous or incomplete by its failure to include language concerning release of third-party).

The parties' subsequent difficulties in negotiating that release language do not prove otherwise. Rather, they show that Hotchkiss tried to *renege* on the August Settlement at its insurer's behest. SOF § C, *supra*; CA-278 ¶12 (Gould admissions about why Hotchkiss did not want to abide by the terms of the August Settlement as agreed); CA-202 (Hotchkiss draft with "the changes requested by

28

counsel for Arrowood"); CA-207 (revised Hotchkiss draft "reflecting the language that the School and Arrowood are prepared to sign," including release language added "at the request of Arrowood").

Hotchkiss's change of heart – whatever the reason – cannot undo the August Settlement. "The terms of a later, unexecuted agreement are not relevant when a settlement has already been agreed to." *In re Lehman Bros. Holdings Inc.*, 2017 WL 3278933, at *3 (S.D.N.Y. Aug. 2, 2017) (explaining that a term added to a written draft agreement cannot undo an oral agreement that was already formed), *aff'd*, 739 F. App'x 55 (2d Cir. 2018); *accord Powell v. Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007) (enforcing oral settlement agreement despite defendant's subsequent "change of heart"); *Backmon v. John D'Amelia & Assocs. LLC*, 2020 WL 311788, at *10 (D. Conn. Jan. 21, 2020) (same), *appeal dismissed*, 2020 WL 4333332 (2d Cir. May 14, 2020).

### C. Under The Correct Legal Test, The August Settlement Is An Enforceable Agreement.

The District Court ought to have analyzed whether the August Settlement was a binding preliminary agreement. Courts applying Connecticut law, which governs the analysis in this diversity case, weigh three factors to make that determination: (1) the language used by the parties; (2) the surrounding circumstances; and (3) the purposes they sought to accomplish. *See Omega*, 432 F.3d at 444 (citing *Klein v. Chatfield*, 347 A.2d 58, 61 (Conn. 1974)). The

*Omega/Klein* factors – which the District Court overlooked – uniformly demonstrate that the August Settlement is binding and enforceable.

> **i.      The Language Used by the Parties Confirms Their Understanding that the August Settlement Is Enforceable.**

The language used by the parties leaves no question that they reached a binding and enforceable agreement.  In analyzing this factor, the Court may account for "oral testimony or correspondence or other preliminary or partially complete writings."  *Winston*, 777 F.2d at 81; *Omega*, 432 F.3d at 444 (citing RESTATEMENT (SECOND) OF CONTRACTS § 27 cmt. c (1981)).

The MOU itself, signed by the parties and their counsel, states that the parties "agreed" to a settlement – rather than "will agree" to settle, "offered" to settle, or "agreed in principle" to settle.  CA-71.  It states what "[t]he settlement is for," rather than what an "offer" or "agreement in principle" is for.  *Id.*  And it states that there would be a release and "documentation" of the agreement already reached, not a future "agreement" yet to be reached.  *Id.*

The very next day, Hotchkiss's counsel treated the settlement as a done deal, writing casually and unguardedly to Doe's Prior Counsel that "I think we just let Judge Bolden's clerk know that *the case has been settled*.  Are you ok if I email him with a cc to you guys?"  CA-74.

The ensuing August 29, 2019 email from Hotchkiss's counsel to the District Court was unambiguous: the parties had "reached a settlement that was memorialized in a memorandum of understanding," and were "currently working on the supporting documentation." CA-58. Such representations are accorded "significant weight" in favor of enforcement. *Backmon*, 2020 WL 311788, at *9 (giving "significant weight" to counsel's email informing the court that the parties "agreed" to a settlement); *accord Audubon Parking Assocs. Ltd. P'ship v. Barclay & Stubbs, Inc.*, 626 A.2d 729, 733 (Conn. 1993) (citations omitted) ("A court's authority to enforce a settlement by entry of judgment in the underlying action is especially clear where the settlement is reported to the court during the course of a trial or other significant courtroom proceedings."); *Vincent v. Hull*, 2012 WL 12883961, at *1 (D. Conn. Dec. 11, 2012) (settlement agreement binding where the parties informed court about their settlement immediately after reaching it), *report and recommendation adopted*, 2013 WL 12123975 (D. Conn. Jan. 23, 2013). And Hotchkiss never objected to the District Court's September 11th Order providing that "[t]he parties have reported that *this action has been settled in full*." A-27.

Even after the parties' efforts to negotiate final documentation reached an impasse, Hotchkiss consistently treated the August Settlement as binding. CA-6 ¶23 (Hotchkiss's counsel threatening to enforce the August Settlement in court);

31

A-141 (Hotchkiss requesting status conference "to discuss the status of *the completion* of the settlement agreement between the parties"); A-142 ("Plaintiff refuses to agree to this additional sentence *despite the term of the MOU requiring a release*"); A-153 (Hotchkiss disputing Doe's characterization of "efforts by the parties to reach *a final settlement agreement*," and stating that Hotchkiss "does not believe that it is *necessary* for the Court to enforce the [MOU]").  At no point did Hotchkiss suggest there was no binding agreement.

This unequivocal language and conduct – none of which the District Court addressed in its Order – leaves no question that Hotchkiss regarded the August Settlement as a *fait accompli* as of August 27, 2019.  *Omega Eng'g, Inc. v. Omega, SA*, 2004 WL 2191588, at *8 (D. Conn. Aug. 12, 2004) (preliminary, unsigned settlement agreement binding, where "it was represented to the court as a *fait accompli*"), *aff'd sub nom. Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437 (2d Cir. 2005).

### ii.     The Circumstances Surrounding the August Settlement Prove the Parties Intended to be Bound by that Agreement.

The circumstances surrounding the August Settlement, which the District Court also ignored, likewise weigh in favor of enforcing the August Settlement.

Most glaringly, the District Court glossed over the undisputed fact that Hotchkiss partially performed the August Settlement, on the very day it was reached, by delivering an oral apology to Doe.  CA-50 ¶8; CA-3 ¶9.  That partial

performance – and not just any performance, but an in-person apology, witnessed by both parties' counsel, admitting Hotchkiss's responsibility for the sexual abuse at the heart of Doe's pending lawsuit (*id.*) – is a compelling indicator that the parties had indeed reached a settlement. *See Powell*, 497 F.3d at 130 (enforcing oral settlement where defendant partially performed by drafting a reference letter for plaintiff); *see also R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75-76 (2d Cir. 1984) (deeming partial performance a "decisive" and "unmistakable signal that one party believes there is a contract").

Other circumstances corroborate the August Settlement's enforceability. The parties' shared objective on August 27, 2019 was to settle the action once and for all. *See Heublein*, 2007 WL 2472018, at *8 (circumstances surrounding the private meeting indicate that the parties intended to resolve the case). All key decisionmakers for Hotchkiss attended the August 27th Mediation, including its Board of Trustees Co-President, Head of School, and insurer. CA-49-50 ¶3; CA-2 ¶5. The parties' negotiations were facilitated by an experienced JAMS mediator. Moreover, before the parties executed the MOU, Doe and Gould conferred one-on-one, outside the presence of counsel, to arrive at a final settlement, after which they shook hands. *Compare* CA-276 ¶5; CA-51 ¶9, *with Heublein*, 2007 WL 2472018, at *8 (parties' conduct during settlement meeting "strongly suggests that they

33

intended to end their differences" and "intended to be bound by whatever agreement they reached" at the meeting).

### iii. Hotchkiss Had Motive and Purpose to Settle When It Did.

Finally, Hotchkiss had motive and purpose to reach a binding settlement in August 2019. The District Court had recently denied Hotchkiss's motion for reconsideration of summary judgment. A-26; A-111-17. After four years of litigation, a public jury trial on Doe's claims was scheduled to begin on November 4, 2019. Striking a settlement at that critical juncture insulated Hotchkiss from "further public airing" of its systemic toleration and concealment of decades of harrowing acts of child sex abuse at issue in the case, additional tarnish to Hotchkiss's reputation, the risk of a multi-million-dollar damages award, and the time and expense inherent in a jury trial. *See id.* (holding that "[s]ettlement of the case at that point in the litigation would have saved the [party opposing enforcement] significant time and expense . . . [and] would have avoided further public airing of their disputes"); *Colapietro v. Dep't of Motor Vehicles Connecticut*, 2011 WL 3349842, at *5 (D. Conn. Aug. 3, 2011) ("[b]oth parties had good reason to settle this case in light of its long history, [defendant's] financial situation, and the cost and uncertainty of trial"); *Directory Assistants, Inc. v. Albano*, 2011 WL 577303, at *3 (D. Conn. Feb. 8, 2011) (same); *Brandt v. MIT*

34

*Dev. Corp.*, 552 F. Supp. 2d 304, 320 (D. Conn. 2008) (same), *order clarified on reconsideration*, 2008 WL 2230152 (D. Conn. May 29, 2008).

All three *Omega/Klein* factors thus confirm that the August Settlement was intended to be, and is, a binding and enforceable agreement.

### D. In Any Event, Hotchkiss Ratified The August Settlement And Is Estopped From Challenging It.

Finally, even if Hotchkiss had not entered into the binding August Settlement with Doe (which it did), it nevertheless ratified and is estopped from challenging the August Settlement by its subsequent acquiescence to the settlement and acceptance of benefits.

A party ratifies a contract where it "accepts the benefits flowing from [the contract] or remains silent or acquiesces in the contract for any considerable length of time after opportunity is afforded to annul or avoid it." *Young v. Data Switch Corp.*, 646 A.2d 852, 857 (Conn. 1994); *see also Schwarzschild v. Martin*, 464 A.2d 774, 777 (Conn. 1983) (internal citation omitted) ("parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract."). "[R]atification evinces a central tenet of contract law: a party should not be allowed to reap the benefits of an agreement while simultaneously claiming the agreement was invalid." *Front St. Commons, LLC v. Acadia Ins. Co.*, 2018

35

WL 7572375, at *4 (D. Conn. Mar. 27, 2018) (citing RESTATEMENT (SECOND) OF CONTRACTS § 380 (1981)).

Here, the undisputed evidence shows that Hotchkiss ratified the August Settlement. For months on end, Hotchkiss treated the August Settlement as binding and enforceable. Hotchkiss began performing under the August Settlement on the day it was reached, delivering a powerful oral apology to Doe. CA-50 ¶8; CA-3 ¶9. Two days later, Hotchkiss reported to the District Court that the parties had agreed to settle the Action. CA-58. On September 11, 2019, when the District Court ordered the case administratively closed (A-27), Hotchkiss accepted the very benefits it had sought: the immediate cancellation of the November 2019 jury trial and all attendant expense and uncertainty.

In the months that followed, Hotchkiss actively exchanged and negotiated draft documentation, participated in additional meetings and mediations with Doe, and repeatedly reaffirmed the September 11 Order's conclusion that the case was "settled in full" by joining consent motions to forestall dismissal – without ever claiming there was no binding settlement or requesting that the case be reopened. A-27-28. Hotchkiss even invoked the August Settlement affirmatively in seeking judicial intervention during the negotiations. *See, e.g.*, A-142 ("Plaintiff refuses to agree to this additional sentence *despite the term of the MOU requiring a release*").

36

All that time, Hotchkiss reaped the benefits of having the case off the trial calendar and administratively closed, and being able to tell the world – including many other victims of abuse, and the thousands of alumni from whom it was actively soliciting donations – that it had resolved matters amicably with Doe. If Hotchkiss had believed the August Settlement was not an enforceable agreement, it should have said so.

Instead, the very first time Hotchkiss tried to repudiate the August Settlement was in June 2020, when it opposed Doe's cross-motion to enforce (A-33) – over nine months after the August 27th Mediation and its representation to the Court that the parties had settled the case. Hotchkiss's nine-month delay in repudiating the August Settlement, coupled with its acceptance of benefits under that agreement, amounts to ratification as a matter of law. *See, e.g.*, *Abbadessa v. Moore Business Forms, Inc.*, 987 F.2d 18, 23 (1st Cir. 1993) (five months of silence too long to defeat finding of ratification); *Suncoast Capital Corp. v. Global Intellicom, Inc.*, 280 A.D.2d 281, 281-82 (N.Y. App. Div. 2001) (six months too long); *Hawkins v. City of New York*, 40 A.D.3d 327, 327 (N.Y. App. Div. 2007) (seven months too long); *Broadmass Assocs., LLC v. McDonald's Corp.*, 286 A.D.2d 409 (N.Y. App. Div. 2001) (eight months too long); *Gengaro v. City of New Haven*, 984 A.2d 1133, 1139 (Conn. App. 2009) (ten months too long).

37

Having waited so long to challenge the August Settlement, Hotchkiss is also equitably estopped from disaffirming it now. Equitable estoppel has two elements: "misleading conduct by one party" and "detrimental reliance thereon by the other party." *Fischer v. Zollino*, 35 A.3d 270, 276 (Conn. 2012); *see also Stewart v. Cendant Mobility Servs. Corp.*, 837 A.2d 736, 746 (Conn. 2003). Both elements are met here.

First, Hotchkiss misled Doe into believing that the parties mutually intended to be bound by the August Settlement. Hotchkiss began performing under the settlement on August 27, 2019, reported the settlement as binding to the District Court, accepted the Court's September 11th Order, negotiated for months as if the August Settlement was binding, and remained silent until June 2020. SOF § B, *supra*.

Further, Doe relied to his detriment on Hotchkiss's deceit. Doe ceased his prosecution of the case, gave up his imminent trial date, and expended substantial time, resources, and emotional effort in trying to negotiate final documentation for a settlement to which he believed Hotchkiss had already agreed. In the intervening months, nonagerian and octogenarian witnesses' memories of events in the 1980s may have faded further, at least one witness has died, another important witness recently announced diagnosis of a terminal illness, and a case that was once trial-ready after thousands of hours of lawyers' and Doe's work, dozens of depositions

38

around the country and overseas, many witness interviews, and millions of dollars of costs would now have to be reconstructed, presumably with new counsel having to assimilate that vast record from scratch. Justice delayed is justice denied.

Because Hotchkiss's misleading conduct induced Doe to change his position for the worse, Hotchkiss is equitably estopped from disaffirming the August Settlement. *See Stewart*, 837 A.2d at 746; *see also Monaghan v. SZS 33 Assocs., L.P.*, 73 F.3d 1276, 1283 (2d Cir. 1996) (upholding enforcement of oral settlement where "plaintiff reasonably relied on the parties' oral agreement in permitting her trial date to pass and in foregoing her right to participate in [a] trial"); *In re Dragone*, 318 B.R. 33, 36 (Bankr. D. Conn. 2004) (enforcing settlement where parties decided not to proceed with scheduled hearing); *Mone v. Park E. Sports Med. & Rehab., P.C.*, 2001 WL 1518263, at *3 (S.D.N.Y. Nov. 29, 2001) (enforcing settlement where "plaintiff gave up her right to the imminent firm trial date"); *Alvarez v. City of New York*, 146 F. Supp. 2d 327, 336 (S.D.N.Y. 2001) (enforcing settlement where "both sides, relying on the apparent settlement, did not resume active litigation of the case").

\* \* \*

Accordingly, the August Settlement formed a binding and enforceable agreement. The District Court's contrary conclusion was reversible error. And because the court relied on that erroneous conclusion to hold that the February

39

Draft was properly enforced against Doe, *that* conclusion was erroneous as well. At an absolute minimum, a remand would be required for the District Court properly to analyze the purported February Draft settlement in light of the parties' existing August Settlement. However, as set forth immediately below, no such remand is necessary: the February Draft is unenforceable as a matter of law.

## III. THE DISTRICT COURT ALSO COMMITTED REVERSIBLE ERROR BY ENFORCING THE FEBRUARY DRAFT.

The District Court erred further by granting Hotchkiss's motion to enforce the February Draft. Hotchkiss never sustained its burden of showing that the draft became a binding contract: it was neither an acceptance by Hotchkiss of Doe's December Offer, nor a new offer by Hotchkiss that was subsequently accepted by Doe. And the court's alternative holdings – that Doe's prior counsel had apparent authority to enter into a binding agreement, or that Doe somehow ratified the February Draft – were likewise erroneous.

### A. The February Draft Was Not An Acceptance, Because Doe's December Offer Was Already Rejected, Countered, and Revoked.

The District Court appeared to assume – without explicitly so finding – that Hotchkiss accepted Doe's signed December Offer in late February 2020, by affixing its own signature pages and sending it back to Doe's counsel. SPA-13 (citing "[Doe's] signature on the Current Settlement Agreement, and the subsequent necessary signatures from Hotchkiss"). But in so holding, the court

40

failed to grasp that by February 2020, Doe's two-month-old December Offer was no longer legally capable of being accepted by Hotchkiss: it had already been rejected, countered, and revoked.

"A settlement agreement is a contract and is interpreted according to general principles of contract law." *Powell*, 497 F.3d at 128. Fundamental principles of contract formation dictate that "[i]f the offeree attempts to add to, or change, terms of the offer, this response is transformed from an acceptance into a rejection and counteroffer." *Dunne v. Doyle*, 2014 WL 3735619, at *18 (D. Conn. July 28, 2014); *Briga v. D'Amico*, 2006 WL 240557, at *4 (Conn. Super. Ct. Jan. 12, 2006) ("It is basic contract law that a change in the terms of an offer constitutes a rejection of the offer and a counteroffer.").

The District Court ignored this bedrock rule of contract formation. It held that by making the December Offer, Doe "agreed to be bound by the terms of the Current Settlement Agreement" – *i.e.*, the February Draft. SPA-14. But in so holding, the court ignored that Hotchkiss explicitly *rejected* that offer, Doe withdrew the offer, and both parties made numerous superseding counteroffers. SOF § D, *supra*; CA-100 (January 3 Rejection); CA-105-06 (January 3 Counteroffer); CA-108 (January 6 Rejection); CA-111 (January 6 Counteroffer); CA-110, 112 (January 13 Counteroffer); CA-114 (January 15 Rejection); CA-277 ¶8 (February 11 Counteroffer).

41

As a matter of law, these multiple rejections and counteroffers extinguished Hotchkiss's power to accept the December Offer long before it purported to do so. *See Dunne*, 2014 WL 3735619, at *18 (no acceptance where counterparty rejected an offer by making a counteroffer); *Heublein*, 2007 WL 2472018, at *4 (following oral settlement, no superseding agreement formed under terms of parties' draft written agreements, where parties exchanged revised drafts with changes, including a release of additional claims); *Cavallo v. Lewis*, 473 A.2d 338, 340 (Conn. App. 1984) (no contract formed where plaintiffs' alteration to draft agreement "terminated their power of acceptance and functioned as a counteroffer"); *Briga*, 2006 WL 240557, at *4 (no contract formed because "the additions to the proposal submitted . . . constituted a counter-offer that had not been accepted").

The District Court also ignored the undisputed evidence confirming that by late January and early February, both parties acknowledged there was no open offer on the table. That is the plain import of the parties' statements to the District Court on January 27, 2020, including counsel for Hotchkiss complaining that Doe "never came back to us" with a proposal and hoping that Judge Garfinkel might "help us come up with language that works for both sides." A-199 at 5:02-06; A-200 at 6:04-05.

42

When the February 11th Settlement Conference concluded with no agreement on final documentation, both Doe and Gould *confirmed* there was no open offer on the table. Doe again told Gould that for tax and other reasons, his 2019 December Offer was no longer viable for him in 2020, and that he would not agree to a broader release than the August Settlement without additional consideration. CA-53-54 ¶¶16-19; CA-279 ¶13. Gould explained to Doe that Hotchkiss, under pressure from its insurer, sought a broader release than had been agreed in the August Settlement – but would not offer additional consideration. CA-54 ¶19; CA-278 ¶12. Gould also repeatedly told Doe that the December Offer was not acceptable to Hotchkiss, and that there was "no meeting of the minds" as to its terms. CA-53-54 ¶¶18-19; CA-278 ¶11. And while Gould's affidavit below claimed that Doe never stated that "his offer to settle was revoked, rescinded, or no longer valid" (CA-191 ¶21), he did not otherwise dispute Doe's account.[7]

In view of this extensive evidence, the District Court clearly erred in finding that "there is *nothing in this record* suggesting that Mr. Doe, himself or through his counsel, expressed to Hotchkiss any intent to repudiate the [December Offer]

---

[7] Gould's statement is a red herring: both parties knew the negotiating history and that the December Offer was already off the table – so there was no need for Doe to revoke or rescind it yet again. Moreover, to the extent the District Court mistakenly deemed this a disputed issue of fact and resolved it against Doe – the non-moving party – without an evidentiary hearing, that was error. Point V, *infra*.

43

before Hotchkiss signed it." SPA-15. The record was replete with such evidence, and under basic principles of contract law, the parties' undisputed rejections, counteroffers, and Doe's revocation unequivocally extinguished the December Offer. Hotchkiss could not unilaterally bypass two months of negotiations and forcibly create a binding contract by "accepting" a non-existent offer. *See Price v. Kennison*, 2010 WL 5610890, at *3 n.5 (Conn. Super. Ct. Dec. 23, 2010) ("A contract cannot be created by acceptance of an offer after the power of acceptance has been terminated [by] . . . revocation.") (quoting RESTATEMENT (SECOND) OF CONTRACTS § 35(2)).

**B.    The February Draft Also Did Not Constitute A New Offer By Hotchkiss.**

Recognizing the insuperable legal hurdles facing its purported "acceptance," Hotchkiss attempted below to recharacterize its delivery of the February Draft to Doe's counsel on February 20, 2020 as a new offer, which it claims Doe subsequently accepted either himself or through Prior Counsel. Of course, that "offer" was a pure *post-hoc* fiction. Hotchkiss labeled its February 20th delivery a "fully executed copy of the Settlement Agreement," attached Doe's (superseded) signature page and new signatures for Hotchkiss, and stated that payment would follow "in accordance with the terms of the Agreement." CA-118; CA-125-27. What Hotchkiss sent Doe's Prior Counsel in February 2020 was a purported acceptance, not a new offer.

44

By definition, an offer must "justify another person in understanding that his asset to that bargain is invited and will conclude it." RESTATEMENT (SECOND) OF CONTRACTS § 24 (1981). But no reasonable person reviewing the February Draft with its apparently already-executed signature pages would have understood it as an offer to which Doe's "assent [was] invited." *Id.* Indeed, it was not even capable of being accepted by Doe. Section 8.2 of the February Draft provides that it would only become effective once Hotchkiss's representatives, *and Doe*, had signed it. CA-124 § 8.2 (defining the "Effective Date" as the date both Hotchkiss and Doe have signed). *See Ciaramella*, 131 F.3d at 324-25 ("effective date" provision demonstrates intent not to be bound until both parties have signed). Thus, "[Doe's] signature was meant to signify his voluntary and informed consent to the terms and obligations of the agreement." *Id.* at 325. That the February Draft had no blank signature page for Doe simply confirms that it was not an offer at all.

**C.     Doe's Prior Counsel Never Had Apparent Authority To Accept The February Draft As A Binding Settlement.**

Even if the February Draft could be construed as a new offer, that would not avail Hotchkiss. Doe never accepted it – and his Prior Counsel lacked apparent authority to do so.

It is axiomatic that the right to settle a case rests with the client (the principal). *Fennell v. TLB Kent Co.*, 865 F.2d 498, 501-02 (2d Cir. 1989). A client does not automatically bestow the authority to settle a case on his retained

45

counsel (the agent). *Id.*; *accord Gomez*, 805 F.3d at 424; *Johnson v. Schmitz*, 237 F. Supp. 2d 183, 188 (D. Conn. 2002); *Acheson v. White*, 487 A.2d 197, 213 n.4 (Conn. 1985) (collecting cases). Rather, counsel's authority to act "may be inferred from words or conduct which the principal has reason to know indicates to the agent that he is to do the act." *Johnson*, 237 F. Supp. 2d at 190 (internal quotations omitted).

Under Connecticut law, apparent authority implicates a two-prong test. The party asserting apparent authority must demonstrate that: (1) the principal held the agent out as possessing sufficient authority to embrace the act in question and knowingly permitted him to act as having such authority, and (2) as a consequence, the person dealing with the agent in good faith and reasonably believed under all the circumstances that the agent had the necessary authority. *See Ackerman*, 4 A.3d at 296; *Tanasi v. CitiMortgage, Inc.*, 257 F. Supp. 3d 232, 278 (D. Conn. 2017) (citation omitted).

"Importantly, under Connecticut law, the burden of proving that the attorney entered a contract on behalf of a client with actual or apparent authority is on the party claiming that the principal is bound by the attorney's act." *Johnson*, 237 F. Supp. 2d at 188 (citing *E.R. Thomas Motorcar Co. v. Town of Seymour*, 103 A. 122, 122 (Conn. 1918)); *see generally Cefaratti v. Aranow*, 141 A.3d 752, 771

46

(Conn. 2016) (party claiming agent had apparent authority bears burden of proof); *Beckenstein v. Potter & Carrier, Inc.*, 464 A.2d 6, 17 (Conn. 1983) (same).

The District Court never applied these legal principles. SPA 16-17. Instead, the court stated that "throughout the parties' course of dealing and settlement negotiations, there is *no indication in writing to Hotchkiss* that Mr. Doe's then-counsel *could not accept* a settlement agreement on his behalf, and certainly not one that he had already signed." SPA-16.

That was triply erroneous. *First*, it was Hotchkiss's burden to prove apparent authority – not Doe's burden to disprove it. *See Johnson*, 237 F. Supp. 2d at 188; *Cefaratti*, 141 A.3d at 771; *Beckenstein*, 464 A.2d at 17. *Second*, Doe was not required to revoke what had never been given: where an agent lacks apparent authority, "a principal has no need to repudiate an agent's unauthorized act in order to 'put things back' the way they were." *McKay v. Longman*, 2017 WL 2124117, at *7 (Conn. Super. Ct. Apr. 17, 2017), *aff'd*, 211 A.3d 20 (Conn. 2019). And nothing in the law requires a party to revoke an agent's authority "in writing." SPA-16. *See* RESTATEMENT (SECOND) OF AGENCY § 119 cmt. a (1958) (agent's "authority is revoked or renounced by written or spoken words or other conduct"); 12 Williston on Contracts § 35:30 (4th Ed. 2000) (same). *Third*, the District Court never cited Connecticut's two-prong test, let alone analyzed whether Hotchkiss

47

met it. These errors mandate reversal. *See, e.g.*, *Fennell*, 865 F.2d at 502;

*Hollywyle Ass'n, Inc. v. Hollister*, 324 A.2d 247, 251 (Conn. 1973).

Moreover, Hotchkiss could not meet its burden of satisfying Connecticut's

two-prong test. Hotchkiss cited no evidence that Doe, the principal, ever held out

Prior Counsel as having authority to accept a settlement offer. *Ackerman*, 4 A.3d

at 296. The unrefuted evidence shows exactly the opposite: that Doe told

Hotchkiss repeatedly – during numerous settlement discussions and proceedings,

including on February 11 – that only he, and not his counsel, had authority to

accept a settlement. CA-275-78 ¶¶2-9; *see also Fennell*, 865 F.2d at 502. Doe

participated personally in all in-person mediations and discussions, negotiated

repeatedly without his counsel and directly with Hotchkiss's principal, Gould, and

had to approve any changes to the draft final agreement. CA-49-54 ¶¶3, 9, 12-19;

CA-189 ¶8; CA-275-78 ¶¶2-9; CA-108 ("Without more consideration, Doe won't

accept it."); CA-114 ( "Our client does not agree. He thinks the release as stated is

too broad."). That is the antithesis of delegated authority.

Nor could Hotchkiss meet the second prong: that it reasonably and in good

faith believed Doe's Prior Counsel had authority to accept the February Draft.

*Ackerman*, 4 A.3d at 296. As discussed, Hotchkiss could not show it "believed"

the February Draft was an offer. Point III.B, *supra.* And it could not establish a

*reasonable, good faith belief* that Doe's Prior Counsel could accept an offer,

48

because the February Draft expressly does not become binding unless and until it is signed by both parties. CA-124 §8.2 ("Effective Date" provision). *See Ciaramella*, 131 F.3d at 324-25 (scrutinizing "effective date" and other parallel provisions to conclude parties did not intend to be bound before signing[8]); *Polk v. Sherwin Williams Co.*, 2017 WL 1186323, at *3-5 (D. Conn. Mar. 29, 2017) (the "unsigned written agreement itself provides evidence that the parties reserved the right not to be bound in the absence of a signed writing"); *see also Kaczmarcysk v. Dutton*, 414 Fed. App'x 354, 355-56 (2d Cir. 2011) (summary order); *R.G. Grp.*, 751 F.2d at 76; *Nieves v. Cmty. Choice Health Plan of Westchester, Inc.*, 2011 WL 5533328, at *5 (S.D.N.Y. Aug. 31, 2011), *report and recommendation adopted*, 2011 WL 5531018 (S.D.N.Y. Nov. 14, 2011). Under no circumstances could Hotchkiss have established apparent authority.

The District Court also relied on Doe's alleged silence *after* his Prior Counsel's alleged acceptance on February 20, about which Doe did not know, to find apparent authority. SPA-17. This defies law and logic. Doe's action or inaction *after February 20* cannot support a finding about what Hotchkiss reasonably and in good faith believed *on February 20*, when it delivered the

---

[8] *Compare* CA-118 (agreement is "entered into as of the Effective Date"); *id.* CA-119-20 §§ 2.1, 2.3 (tying the parties' obligations to the "Effective Date"); *id.* CA-123 § 6.2 (merger clause; amendments must be in writing and signed); *id.* CA-125-27 (signature blocks for parties, but not for counsel).

49

February Draft to Doe's Prior Counsel.  Hotchkiss must show "positive actions or manifestations by [Doe] to [Hotchkiss or its counsel] that would reasonably lead that counsel to believe that [Doe's] attorneys were clothed with apparent authority."  *Fennell*, 865 F.2d at 502.  But Hotchkiss did not, nor can it, proffer any evidence of "positive actions or manifestations" by Doe.  To the contrary, it is undisputed that Doe had no further communications with Hotchkiss or its counsel after February 11.  *See Johnson*, 237 F. Supp. 2d at 191 (because "settlement conference failed to achieve any settlement, and defendants had no further direct contact with [plaintiff], there was no opportunity for him to have manifested the apparent authority defendants claim"); *Musso v. Seiders*, 98 F. Supp. 2d 197, 200 (D. Conn. 1999) ("The record is entirely devoid of evidence to show that the defendants themselves took any positive action that would show that [the attorney] had the apparent authority to settle the [client's] claims against them."); *see also Edwards v. Born, Inc.*, 792 F.2d 387, 390-91 (3d Cir. 1986) (apparent authority not present where record devoid of direct communication from client to opposing attorney).

In any event, Doe was not "silent".  He promptly challenged his counsel's purported authority and acceptance less than three weeks after Hotchkiss sent the February Draft.  A-167-70; A-171-74; Point III.D, *infra*.  The District Court, once again, ignored this record entirely.

50

**D.    Doe Never Ratified His Prior Counsel's Purported Acceptance Of The February Draft.**

The District Court also erred in concluding that Doe ratified the February Draft "by accepting and then spending some of the settlement proceeds sent by Hotchkiss under the [February Draft]."  SPA-19.

Doe's receipt of settlement proceeds was not a ratification because he did not accept the money *pursuant to the February Draft*; rather, Doe had an independent claim to the very same payment under the August Settlement.  It is well settled that "a principal does not ratify an act by receiving benefits when the principal has an independent claim to the benefit."  *Weeks v. United States*, 144 Fed. Cl. 34, 50 (Fed. Cl. 2019) (rejecting ratification of settlement agreement because principal obtained benefit under a prior agreement) (citation omitted).  *See* RESTATEMENT (THIRD) OF AGENCY § 4.01 cmt. g (2006) ("A person may ratify an act under subsection (2)(b) by receiving or retaining benefits it generates if the person has . . . *no independent claim to the benefit*."); *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 1994 WL 560978, at \*11 (S.D.N.Y. Oct. 12, 1994) (ratification theory "untenable," where "[plaintiff] merely received payment to which it was already entitled") (citation omitted); *cf. Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 92 (2d Cir. 2013) ("A party cannot establish justifiable reliance by alleging it was induced to perform an existing legal obligation."); *Cook v. Ball*, 144 F.2d 423, 432-34 (7th Cir. 1944) (equitable

51

estoppel inapplicable where benefit merely confers amount to which plaintiff is already entitled).

The District Court recognized this legal rule, but erred in applying it. The court relied on its earlier conclusion that the August Settlement was unenforceable, as well as the merger clause in the February Draft purporting to "supersede[] any prior agreements," to find that Doe had no "independent claim" under the August Settlement. SPA-20. But as established above, the August Settlement *was* an enforceable contract. Point II, *supra*. And citing the merger clause *in the February Draft* to establish that Doe ratified *the February Draft* is circular reasoning. The clause was irrelevant unless Doe had already accepted it – which he did not. Accordingly, Doe had an independent claim to the settlement payment under the August Settlement, and there was no ratification.[9]

Even if the August Settlement were *not* enforceable, the fact remains that Doe believed it was. CA-278-82 ¶¶ 10-26; A-144; CA-292 (instructing Prior Counsel to write "For August 27, 2019 Settlement Agreement, Under Protest" on settlement check). That is critical because under Connecticut law, Hotchkiss bore

---

[9]    Doe also had an independent claim to the other settlement benefits. As shown, both the apology and Sexual Misconduct Advisory Committee were agreed in the August Settlement oral agreement. SOF § B, *supra* (describing August Settlement). Thus, Doe did not ratify the February Draft by "accepting" those benefits. The District Court, by focusing only on the MOU (SPA-12-13), missed this point. Point II.A, *supra*.

52

the burden of proving that Doe *intended* to ratify. *See Updike, Kelly & Spellacy, P.C. v. Beckett*, 850 A.2d 145, 164 n.21 (Conn. 2004) (explaining that "intention is a *mental fact*," and "ratification [] depends ultimately upon the intention with which the act or acts, from which ratification is claimed, were done"); *Ahrens v. Dunkin' Brands, Inc.*, 2011 WL 60517, at *8 (D. Conn. Jan. 4, 2011) (party must have an "intent to ratify" before being deemed to have ratified); *Botticello v. Stefanovicz*, 411 A.2d 16, 20 (Conn. 1979); *see also Cmty. Collaborative of Bridgeport, Inc. v. Ganim*, 698 A.2d 245, 255 n.8 (Conn. 1997) ("intention is an essential element in the doctrine of ratification") (citation and internal quotation marks omitted). Doe's subjective – and entirely reasonable – understanding that the August Settlement was enforceable, and that he was accepting payment thereunder, defeats any finding of intent to ratify.

The District Court never addressed Doe's intent. SPA-18-21. It focused on the fact that *Hotchkiss* sent the payment to Doe's Prior Counsel "under the Current Settlement Agreement." SPA-19. But what mattered was *Doe's intent* in *accepting* the payment, and the evidence unambiguously shows that Doe did so pursuant to the August Settlement only. CA-279-82 ¶¶14, 20-22, 26.

In a related error, the District Court refused to consider compelling evidence of Doe's intent: the emails in which Doe specifically directed his then-counsel to tell the District Court and Hotchkiss that he had *rejected* the February Draft, and

53

was only accepting payment "under protest," and pursuant to the August Settlement. SPA-17-18 n.4; *see* CA-284, CA-286-89, CA-291-96, CA-298-304.

The District Court failed to apprehend that this evidence bore decisively on the ratification inquiry, concluding that "[b]ecause there is a sufficient basis on this record for Hotchkiss relying on the actions of Mr. Doe's third set of counsel," it "need not and does not" consider the emails at all. SPA-17 n.4. But for ratification, it was *Doe's* intent that mattered, not Hotchkiss's, *see Ahrens*, 2011 WL 60517, at *8, and this evidence was directly relevant to Doe's intent.

The court also erred in finding that the emails were "privileged attorney-client communications between Mr. Doe and [his then-counsel], . . . whose probative value, to the extent relevant at all to this inquiry, is outweighed by their heavily redacted nature." SPA-17 n.4. While portions of the documents were indeed redacted, this was not a case of selective waiver at all. *First*, the unredacted passages were not privileged: they consisted of client-to-attorney communications that were "meant to be passed on to third parties," namely Hotchkiss, Magistrate Judge Garfinkel, and the District Court. *In re von Bulow*, 828 F.2d 94, 102 (2d Cir. 1987); *see also United States v. Tellier*, 255 F.2d 441, 447 (2d Cir. 1958) ("communications between an attorney and his client, though made privately, are not privileged if it was understood that the information communicated in the conversation was to be conveyed to others").

54

*Second*, the redacted passages *were* privileged, and Doe appropriately redacted them to avoid any claim of waiver. If that somehow disqualified the documents as selectively incomplete, then litigants could never rely on documents that incorporate privileged communications. That is not and cannot be the law, and the District Court's refusal to consider this compelling evidence on completeness grounds improperly penalized Doe for trying to protect the attorney-client privilege. *See Murtha v. New York State Gaming Comm'n*, 2020 WL 5504311, at *2 (S.D.N.Y. Sept. 9, 2020) (noting it "possible – indeed, common – that a document will contain some information protected by a privilege and some information that is not," in which case "production . . . with partial redactions is proper").

The District Court also found that Doe had no independent claim to payment under the August Settlement because the MOU contemplates payment "within thirty (30) days of settlement execution." SPA-21 n.5. But it was *Hotchkiss*, for reasons of its own, that chose to send the payment to Doe's Prior Counsel without waiting for Doe to execute the February Draft "offer." By doing so, Hotchkiss waived the very protection it had bargained for in the MOU: the right not to make payment before a final agreement was signed. *See Design Tech, LLC v. Moriniere*, 76 A.3d 712, 720 (Conn. App. 2013) ("[A] party to a contract may waive a condition precedent to [its] own performance of a contractual duty.") (citing

55

Williston on Contracts (4th Ed. 2000) § 39:17). And Doe – after six months of fighting Hotchkiss's efforts to renege on the August Settlement, after moving to enforce it and thus compel the payment (A-144), and after directing Prior Counsel to make his position clear to Hotchkiss – was under no obligation to turn it down.

The District Court also erred in concluding that Doe failed to repudiate the February Draft with sufficient dispatch. SPA-18. The undisputed evidence proves otherwise. Not only did Doe immediately and repeatedly instruct his Prior Counsel to reject it (instructions that counsel evidently ignored, without Doe's knowledge), but on the March 13 conference call with the District Court – less than three weeks after Hotchkiss sent the February Draft to Doe's Prior Counsel – Doe himself told Hotchkiss and the District Court that there was "no new agreement." CA-20 at 11:07-08. And by April 29, Doe's current counsel had advised Hotchkiss's lawyers that "the December proposal, which your client purports to have signed in February, never became a binding agreement." CA-173. Doe moved (again) to enforce the August Settlement the next day. A-193-94.

As a matter of law, these unambiguous steps to repudiate were sufficiently prompt to defeat a finding of ratification. *See Leser v. U.S. Bank Nat. Ass'n*, 2012 WL 4472025, at *20 (E.D.N.Y. Sept. 25, 2012) ("courts in this circuit and elsewhere have held that intervals of between three to four months, coupled with reasonable investigation, to be insufficient to establish ratification"); *Capital Dist.*

56

*Physician's Health Plan v. O'Higgins,* 951 F. Supp. 352, 362-63 (N.D.N.Y. 1997) (no ratification where party waited for four months between discovery of objectionable transaction and actual objection), *vacated pursuant to settlement sub nom. Capital Dist. Physicians Health Plan, Inc. v. O'Higgins*, 1998 WL 34083619 (N.D.N.Y. Jan. 8, 1998); *Bernstein v. Centaur Ins. Co.*, 644 F. Supp. 1361, 1370 (S.D.N.Y. 1986) (three-month silence after learning of unauthorized acts did not amount to ratification); *In re Eicholz*, 310 B.R. 203, 208 (W.D. Wash. 2004) (three-month delay does not support ratification).

Finally, principles of equity, which the District Court also ignored, cut against finding ratification. Doe should not be bound by the February Draft when he adamantly refused to consent to the offer, voiced his lack of consent to his Prior Counsel – who collected their large contingency fee and ignored his objections – and, after suspecting his Prior Counsel's unauthorized conduct, terminated their representation within days and promptly notified Hotchkiss and the District Court of his true position. Under these circumstances, binding Doe to the February Draft would mean that a party can be coerced into a contract to which he does not consent due to the errant actions of his legal counsel and his adversary's self-serving purported ignorance as to same. This outcome subverts settled principles of contract formation and agency law, as well as public policy, and should not be countenanced by this Court.

57

**IV.    IF NEITHER SETTLEMENT IS ENFORCEABLE, THIS COURT SHOULD REMAND THE ACTION FOR TRIAL.**

Though Doe maintains, as shown, that the August Settlement is the only operative agreement, Doe also recognizes that this Court ultimately may conclude that *neither* the August Settlement nor the February Draft is enforceable – *i.e.*, that the parties never actually settled the case.  If so, then the matter should be remanded for a jury trial on the merits.  *See, e.g.*, *Ciaramella*, 131 F.3d at 326 (vacating trial court order enforcing settlement and remanding case for further proceedings); *Indiaweekly.com, LLC v. Nehaflix.com, Inc.*, 2011 WL 13228319, at *1 (D. Conn. Feb. 4, 2011) (denying motions to enforce and ordering case to proceed to trial); *Johnson*, 237 F. Supp. 2d at 192 (denying motion to enforce settlement entered into by plaintiff's counsel without actual or apparent authority, and noting that case would proceed to trial); *Ghilduta v. Trump Corp.*, 2007 WL 9813779, at *4 (S.D.N.Y. Nov. 5, 2007) (same); *E&W Const., Inc. v. Purcell*, 2005 WL 407584, at *2 (Conn. Super. Ct. Jan. 12, 2005) (concluding there was never an "actual meeting of the minds among the parties, as distinguished from their counsel, as to the precise terms of the settlement," and setting the case for trial).

58

## V.     ALTERNATIVELY, THIS COURT SHOULD REMAND FOR AN EVIDENTIARY HEARING.

Alternatively, if this Court determines that there are disputed issues of fact as to the existence of a binding settlement, it should remand for an evidentiary hearing.

A trial court's inherent authority to grant summary enforcement of a settlement obtains "where the terms of the agreement are 'clear and unambiguous.'" *Omega*, 432 F.3d at 444 (quoting *Audubon*, 626 A.2d at 744)). But summary enforcement "is ill-suited to situations presenting complex factual issues related either to the formation or the consummation of the contract, which only testimonial exploration in a more plenary proceeding is apt to satisfactorily resolve." *Autera v. Robinson*, 419 F.2d 1197, 1200 (D.C. Cir. 1969). "Whether there had been a meeting of the parties' minds is clearly a question of fact, and it [is] error for the district court to attempt to resolve this question based solely on affidavits and briefs." *Ozyagcilar v. Davis*, 701 F.2d 306, 308 n.* (4th Cir. 1983).

Accordingly, where factual issues are genuinely in dispute, an evidentiary hearing is required. *See, e.g.*, *Gomez*, 805 F.3d at 425 (evidentiary hearing required to resolve factual dispute on whether plaintiff's attorney had authority to settle) (citing *Michaud v. Michaud,* 932 F.2d 77, 81 (1st Cir. 1991)); *Rothenberg v. Kamen*, 735 F.2d 753, 754 (2d Cir. 1984) (remanding for evidentiary hearing where plaintiff raised colorable claim that settlement was obtained by fraud).

59

Other Circuits likewise uniformly recognize that "[w]here material facts concerning the existence or terms of an agreement to settle are in dispute, the parties must be allowed an evidentiary hearing." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987). *See, e.g.*, *Autera*, 419 F.2d at 1202; *Kukla v. Nat'l Distillers Prod. Co.*, 483 F.2d 619, 622 (6th Cir. 1973) ("the Court could not properly resolve this substantial factual dispute . . . by merely weighing the affidavits and relying upon the unsworn statements of counsel"); *Ozyagcilar*, 701 F.2d at 308; *Hensley v. Alcon Labs., Inc.*, 277 F.3d 535, 541 (4th Cir. 2002) ("plenary evidentiary hearing"); *Saudi Basic Indus. Corp. v. Exxon Corp.*, 364 F.3d 106, 113 (3d Cir. 2004); *Bobonik v. Medina Gen. Hosp.*, 126 F. App'x 270, 274 (6th Cir. 2005) ("[t]he trial court may not dispense with an evidentiary hearing [] when the situation presents complex factual issues related [] to the formation . . . of the contract"); *Sims-Madison v. Inland Paperboard & Packaging, Inc.*, 379 F.3d 445, 449 (7th Cir. 2004); *United States v. Hardage*, 982 F.2d 1491, 1496 (10th Cir. 1993).

Here, Doe presented copious evidence in the District Court – including an extensive documentary record and three detailed sworn Declarations, one from Prior Counsel – showing that (a) the parties entered into the enforceable August Settlement, (b) the December Offer was rejected, countered, and revoked before Hotchkiss purported to accept it; (c) Doe clearly communicated to Hotchkiss that

60

only he, not his counsel, had authority to accept a settlement, and (d) Doe accepted the settlement payment pursuant to the August Settlement only. *See generally* SOF §§B-F; *see, e.g.*, CA-49-54 ¶¶3-9, 15-19, 22-23; CA-275-78 ¶¶2-14; CA-2-7 ¶¶3-26.

At a bare minimum, Doe's evidence gave rise to material issues of fact. The District Court was not authorized to disbelieve those declarations, disregard that evidence, and resolve those issues against Doe summarily, without an evidentiary hearing – particularly concerning the February Draft, where Doe was the non-moving party. Neither the principle of "inherent authority" nor the convenience of "summary enforcement" can defeat the rights of litigants under the Federal Rules of Civil Procedure and the dictates of due process, including the right to have disputed issues of material fact resolved based on live testimony and cross-examination, rather than affidavits and the assertions of counsel. Accordingly, "the District Court erred in failing to conduct an evidentiary hearing which would have at least afforded an opportunity for the Court to properly judge the credibility of the affiants and an opportunity for their cross-examination." *Kukla*, 483 F.2d at 622.[10]

---

[10] The District Court noted that at oral argument, "both parties agreed that an evidentiary hearing was not necessary." SPA-10 n.3. That is still Doe's position: a hearing is not and was not *necessary* to rule in his favor, because the August

61

## CONCLUSION

Mr. Doe respectfully requests that this Court (i) reverse the judgment of the District Court, enforce the August Settlement, and decline to enforce the February Draft; (ii) alternatively, if the Court finds no enforceable settlement agreement, remand for a jury trial on the merits; or (iii) alternatively, remand for an evidentiary hearing on disputed issues of material fact.

Respectfully submitted,

Dated: New York, New York
      November 24, 2020

**KASOWITZ BENSON TORRES LLP**

By:   */s/ Jed I. Bergman*
        JED I. BERGMAN

1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800
Email: jbergman@kasowitz.com

*Counsel for Plaintiff-Appellant John Doe*

---

Settlement controls (and the February Draft does not) as a matter of law. But failing that, an evidentiary hearing is required.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(5)(A) and Local Rule

32.1(a)(4)(A), I hereby certify that the foregoing brief was produced using the

Times New Roman 14-point typeface and contains 13,962 words.

/s/ Jed I. Bergman
JED I. BERGMAN
KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Tel: (212) 506-1700
Fax: (212) 506-1800
Email: jbergman@kasowitz.com

*Counsel for Plaintiff-Appellant John Doe*

November 24, 2020

63